Last case is Beatty Philadelphia v. City of Philadelphia Chamber of Commerce v. City of Philadelphia Committee. Thank you Judge McKee and may it please the court, my name is Marcel Pratt and I am the City Solicitor of the City of Philadelphia and I would like to reserve five minutes for rebuttal. You've been in the cheap seats all week long, you've been sitting back there spying on us? Did you finally get up into the front row? I learned a thing or two. Okay, we'll find out. You finally make it up into the block, into the orchestra seating. Congratulations. So today first I'll discuss the district court's flawed ruling that the inquiry provision of the wage equity ordinance does not satisfy intermediate scrutiny. And then I'll discuss the correct part of the district court's ruling that the reliance provision regulates conduct and not speech. Let's start with whether or not the district court got it right in applying intermediate scrutiny. Because I think your friends at Reserva said that it's strict scrutiny and not commercial speech. Yeah, we can deal with that pretty easily. So for four decades now, the Supreme Court has applied intermediate scrutiny to content-based, speaker-based commercial speech. And we have to take the Supreme Court at its word. If it wanted to change the law, it would have done so and it would have done so explicitly. And what we've seen is that over the course of time, that has not changed. If you think about RAV, which the chamber relies upon heavily, RAV was decided in 1992. Since then, Central Hudson and RAV have coexisted for 27 years at this point. Sorrell and Reed as well, they didn't change the law either. They all talk about heightened scrutiny. Well, heightened scrutiny is a reference to a level of scrutiny other than rational basis. And that's a point that this court has made in the sense of this court has referred to heightened scrutiny in other cases and it simply meant something above rational basis. And the Ninth Circuit en banc makes this point beautifully in the RDN versus Predo case, where it talks about the meaning of heightened scrutiny. And it talks about a part of Sorrell where they say, well, Sorrell mentioned heightened scrutiny, but it cites the cases that applied intermediate scrutiny, such as the Discovery Network case. So, again, I think that point is pretty easy for us to deal with. No court has done what the chamber is asking this court to do. And every court to confront this exact question of whether or not intermediate scrutiny or whether or not Reed or Sorrell has somehow changed Central Hudson has answered in the negative. And specifically, I'm talking about the Eighth and Ninth Circuits, and we cite those cases in our briefs. So where I wanted to start was with some foundational concepts that are indisputable, that go to the foundation of this ordinance. It's indisputable that there are racial and gender wage gaps in this country. No one disputes that. The researchers see it in the data. Women and people of color see it in their paychecks. It's not in dispute. It's also indisputable that there's a consensus among labor market researchers that the wage gap is, in part, caused by discrimination. That's not it. Well, you say there's a consensus. Where on the record did you introduce evidence of that record, of that research? Professor Madden. Okay. Professor Madden. And she testified. Her affidavit was submitted after the ordinance was enacted? Yes, that's correct. Does that matter that her testimony was not available to the city council when the ordinance was being considered? Absolutely not. We're entitled to come forward with evidence at the time of challenge that supports the inference. And if I may, I just want to read a very dispositive quote from this court's decision in Phillips. There is a significant difference between the requirement that there be a factual basis for a legislative judgment presented in court when a judgment is challenged and the requirement that such factual basis have been submitted to the legislative body prior to the enactment of the legislative measure. We have always required the former. We have never required the latter. And I think this court's cases show that that to be true, that you can come forward at a later point in time or when the challenge comes to court to justify the inference that the legislature drew. So you're just saying basically she validates the findings of the municipal body? Exactly, yes. That's correct. And so, again, that point, this consensus around discrimination being embodied in the wage gap is really indisputable. And experience keeps telling us that this wage gap will not go away on its own. And so when you're confronting... Does this show that precluding employers from considering wage history will meaningfully impact or address that discrimination? Well, I think we get there through the evidence that I want to talk about today and also just simple common sense and an empirical basis for it. Because, again, what we know is that when you're a woman or a person of color, and, again, we're talking about in the aggregate, if employers are going to use your prior salary history as a basis to pay you, your baseline is going to be lower. And that's precisely because of the wage gap and because your prior salary history is tainted by discrimination. And so it's a logical inference to say, and, again, we have more to back this up, but if an employer is going to rely on this lower baseline, which is in part caused by discrimination, that you're going to keep perpetuating the wage gap. And we don't have to prove the point because the Supreme Court has never said we have to come forward with that level of specificity. But I want to jump back to this common sense point because when you're confronted with this problem, I think common sense might lead you to the following epiphany. If the lower salary histories of women and people of color are tainted by discrimination and employers keep relying on them, then how about we try having employers not ask for prior salary histories? That is the logic behind the wage equity. And that is, quite frankly, the most common sense solution to this problem. But we don't stop with common sense. We have evidence to back it up in specifically four categories. First, Professor Matten, who is one of the top labor economists in the country. But she can't really say that this will cure it. She can't, and no one does. Even during the city council testimony, Councilman Greenlee said that this isn't going to completely solve it, but it'll help. It'll help. So we don't even know it will help. We assume it will help, but we don't know it will help. What if we find out there are more and more cities and states that are adopting this type of regulation? What if we find out five years down the line that it doesn't help? Yeah, well, I mean, that's what legislatures do, right? They try out measures that are drawn based on the evidence, and they draw a logical inference. And if something isn't working, they tweak it. And that's just simple legislative policymaking at work. And I think that's done pretty routinely by legislative bodies. How about the response by the chamber of that? This is useful information for us to learn what a position like this is being paid through other employers in the city. Yeah, they have other sources. In other words, this is what this job is worth, and that'll give us a baseline to decide what we're going to pay this candidate. There are other sources of that information. That data is available in other places. But I also think that if the employers access market wage data all the time, and I think that data is available out there. But I think if the chamber wants to figure out things like how much would it take to afford this particular person, as well as if they're skilled or experienced or they're educated because they've said that salary history is a proxy for those things, those are all things you can simply ask. I mean, this ordinance is very narrow. It prohibits one question and one question only. You can still ask people, how much would it take for you to come here and work for us? This job pays $30,000. Is that enough for you? If it's not, then tell us why. What you can ask is what you were earning at your last position. Right, and that is the only question. That is all. Interesting. I just didn't do this before, but just while you're speaking, I just typed in the query average salary legal secretary of Philadelphia. I got back ranges from $45,000 to $59,000 with an average base salary of $51,376. It took me about five seconds, maybe three seconds to do that. One finger was sore. It took me longer than I normally would. I think it's pretty easy to do. You can figure out a lot of things online and through other types of research. But in terms of the district court's mistakes that it made, first I want to start with how high it set the bar. Because the district court essentially said that we have to prove scientifically that this ordinance would, as a matter of fact, close the wage gap. The problem with that is the Supreme Court has never said that. The Supreme Court has never said that under intermediate scrutiny, you must prove that your piece of legislation will work. Because it said it under strict scrutiny. That was my lobbying you. I'm not the only one who threw a softball. I think with strict scrutiny, you have to get pretty close. In Burson, it was a strict scrutiny case dealing with bubble zones around polling places, and the court said that the legislature could rely upon common sense. In Florida Bar, the Supreme Court did say that history, consensus, and common sense can even get you past strict scrutiny. But they also had a 106-page study. I'm not sure how good it was, and the Senate takes issue with it. In Florida Bar, to back up the legislature's finding. Yes, and I don't think we necessarily need to focus on page counting here, because if you look at the evidence of what that 106-page study was, it was a collection of anecdotal evidence, some surveys from people. So Florida Bar was a case about it was a law that prohibited attorneys from sending mailing solicitations to people who had suffered an injury in an accident within 30 days. And the idea was to sort of protect people's privacy, as well as to protect the reputation of lawyers in Florida. And what the Supreme Court had before it was, in this 106-page summary, was some anecdotal evidence, some surveys from people saying, you know, we don't like to receive mailing solicitations, and also some data about the number of mailings that go up. It didn't have any sort of empirical demonstration that, you know, if you decrease attorney solicitations within a certain time period, that it was going to somehow have an effect, a measurable effect, on the reputation of attorneys or how harassed people feel. And even before the Supreme Court got to the 106-page summary, it reminded us that you can satisfy intermediate scrutiny in the commercial speech context just based on history, consensus, and simple common sense. And so even that case didn't draw that exact connection. But, you know, in terms of what the district court here, so not only what the district court did here, not only did the Supreme Court never say you have to make this type of a scientific demonstration, but what the district court required here was impossible. It was impossible for us to meet because no one else has done it before. You know, the suggestion is that we somehow perform some controlled study where you look at one jurisdiction who hasn't done it and one jurisdiction who has. I mean, that could take years. But the simple point here is that that's not required under intermediate scrutiny. Is any other jurisdiction doing this, at least one that you know of? Are there other jurisdictions? Do you have such an ordinance? Oh, yes, yes. And I believe the Massachusetts brief provides a link to all the jurisdictions that are doing this. But California, for example, they've had their law in effect for over a year now. It does the same thing that our law does. New York City, theirs went into effect in October of 2017. Delaware has this type of law. Connecticut, Oregon. I don't know if I already said Massachusetts, San Francisco, Vermont. The list has grown. The list has grown. Since the list has grown, does that increase the amount or the quantum of evidence you need to come forward with to sustain your burden? It certainly helps. I think it helps for us to be able to say other jurisdictions, other states and cities that are confronted with the same problem that we have, they've drawn the same inferences as we have. But in this case, do we have to look at the situation as it existed at the time that this action was filed? Well, we can still come forward with evidence, as we talked about earlier, at the time of the challenge. But at the time that this was being considered before city council, city council knew Massachusetts was doing this because Massachusetts passed their law before the city did. I mean, ours was slated to go into effect first, but they passed their law before we did. We also knew at the time that New York City was considering the same measure. And that's discussed on the record before city council. You mentioned Dr. Madden, is it? Yes. A number of times. She was apparently a very important witness before the city council. Dr. Madden did not testify before city council. She did? Oh, she submitted a report. Yes. So as you know, there was no evidentiary hearing in this case. But we did submit Professor Madden's affidavit to our briefing during the preliminary injunction. It doesn't matter her too, in the absence of any legislative hearing. Why? Because in your colleagues or them, I just think, well, look, it's irrational. It's irrational to show that. They didn't even attempt to have any hearings to establish a record that would support that one, or more importantly, that this measure would deal with that discrimination. Oh, no, we had a very robust legislative hearing. What we didn't have was an evidentiary hearing before the district court. So again, the case was in the district court for a year. In the evidentiary hearing, you took into account reports of expert reports. Is that the way it worked? At the evidentiary hearing? Yes. So we didn't have one. The district court did not have an evidentiary hearing. I assume you're talking about legislative hearings. Yes. Before city council, there was a bunch of evidence available to city council. So we had the head of our anti-discrimination agency in Philadelphia, the Philadelphia Commission on Human Relations. She testified about it. We had a number of policy experts testify as well, or the so-called policy experts as the chamber calls them at page 46 of their Step 2 brief. But I think the Women's Law Project and the American Association of University Women might know a thing or two about wage equity and policy. Who is Victoria Budson? What is her position and what are her qualifications? Victoria Budson, so she provided some analysis in an article that we attached to our preliminary injunction papers. But she is a professor, I believe, at Harvard. Okay. She did not come in before city council. That was like Madden. That was something that was submitted to the- Right. Yes. She did not testify. But at city council, again, we had the Women's Law Project, which supported this ordinance. And they didn't just provide unsupported opinion. They relied on, for example, the EEOC manual, which talks about the dangers of relying on prior salary history. They also cited to a settlement that Boeing had, an equal pay case. Boeing was sued under the Equal Pay Act, and because they were using prior salary history to set new salaries. And how did they settle the case? They said, we're going to stop relying on prior salaries. And so the Women's Law Project talked about that case. The district court, you're talking about prior salaries, but the district court determined that Dr. Madden presented little support for her supposition. The salary differences are not explained by legitimate factors, such as credentials or qualifications. So what is your take on that? The district court got that completely wrong. So if you read Professor Madden's affidavit, she says that discrimination plays a substantial part in the wage gap that we have. And the district court is talking about the Blaum-Kahn study that Professor Madden relied on. And that study talks about how when you control for factors like education, experience, and area of region, that you still have a wage gap. And so they say the unobserved portion is about 38%. But district court got it so wrong that the authors of the study, who have been studying this for a very long time, they filed comments to the amicus brief that was filed by the Women's Law Project and 36 other organizations in this case. And they say the district court got it wrong. That part of district court's opinion that says legitimate factors could be explaining the wage gap, Blaum-Kahn said, no, that's not what our study stands for. We very much think, after controlling for all of these factors, that discrimination plays a part in the wage gap. Where did they say that? Submission to the district court? No, they filed this after the district court's opinion came out. It's a comment to the Women's Law Project amicus brief at Appendix D that's filed in this court. What about the remedy saying that, granted that there is a disparity, that the remedy that has been adopted is too broad, that your opponents, the chamber says, you ought to require employers in Philadelphia to do rigid self-evaluation, for instance. Is the remedy you select too broad under this issue of commercial speech than what the remedy should be? No, because this is the most direct way of addressing this problem. I mean, we're trying to achieve wage equity, and we know that because of discrimination, the baseline for women and people of color is much lower. And so I know the chamber has talked about encouraging self-evaluations. But, again, this hasn't gone away on its own, this wage gap problem. So the idea of encouraging the self-evaluation and not legislating through the solution that we know to be directly targeted to this problem doesn't make sense. And I know the idea of a self-evaluation has been thrown out in other contexts as a supplement to what we're doing here, but not as an alternative. You say directly targeted, and yet no witness can come forward and say, yes, this will work. We have history. We have studies that talk about this unexplained gap after you consider experience, after you consider education, after you consider the personal capabilities, that there is a gap. We can't explain why the difference still exists. But no one so far has been able to come forward and say, and the chamber comments on this frequently, that your remedy is going to solve that gap. It's going to help solve the gap. That's the position. But, again, because of the gap... Can anyone say it is going to help? I mean, we think about it. We speculate about it. We can't think of any other way to attack it. But is that sufficient? It is sufficient. And, again, going back to what the Supreme Court said in cases like Alameda Books, when you're trying out a new solution, you're not going to have data on its efficacy, precisely because it's a new solution. And also with intermediate scrutiny, I mean, you're striking a balance here. On the one hand, you want courts to engage in an independent examination to ensure compliance with the Constitution, but it also reflects the deference and the leeway that you're supposed to give to the legislative body. I mean, Turner and other cases that the Supreme Court has dealt with talked about this idea of allowing legislatures to make predictive judgments. That's called policymaking. And especially when it comes to innovative solutions to difficult problems, you're not always going to have the evidence. But the best thing you can do is prove to the court that you have drawn a logical inference based on substantial evidence, and that's what we have here. Speaking of that, you mentioned the Florida Bar case, but the Florida Bar conducted a two-year study before it made its determinations, and the city has not done anything like that here. No, we did not commission a two-year study. And I do think it was a mistake by the district court to focus on this idea of page counting the legislative record or how long the study took, because the Supreme Court has never said, you get more deference if your report is very long or voluminous, or you get more deference because you had hearings that lasted for a certain period of time. The city, of course, becomes more supportive of your ultimate decision. Right, but I think in terms of the evidence that was before city council and the evidence that we've put before the court now, it is based on years of study. I mean, I think the wage gap, the studies that we have that look at the wage gap, I mean, they go back decades. I mean, this has been studied for a very long time, and you have the consensus over the course of decades that discrimination paints wage history information, and that's a very powerful piece of evidence. And I know we didn't commission studies ourselves to prove that point, but, again, there's an academic consensus that's been around for quite some time. Let me ask you a hypothetical. A young woman comes in to get a job. She's been working as a barista and being paid 75% of what the male baristas are getting, and she comes into a restaurant to get a job in the restaurant, and so the manager of the restaurant says, where have you been working? And she says and explains it, and then he says, well, I want to get a quick evaluation of you from your former employer. Give me the name and the telephone number. He goes in the back room. He pulls him up, and he says, Mary Jones is here. How much were you paying her? There's nothing to stop that, right? So the ordinance on his face does not prevent an employer from doing that, and some other states go that far, but this ordinance does not. But even if the employer were to do that, the employer can't rely on that information in setting the salary of the new employee because the reliance provision would prohibit that. How can you tell reliance, though? I mean, how can you tell what's going on in his head after he gets that information from the former employer? I mean, I think we would have to prove it the same way you prove any other anti-discrimination case where you don't know what's going on in someone's head, but I think that's why the inquiry provision is so important because the inquiry provision is the enforcement tool, right? So if you prevent employers from getting the information in the first place, then you don't necessarily have to worry about this problem of reliance. But are you really preventing them when the employer can go in the back room and call up right away and say, what was she making? Well, the employer can't rely on the information once they get it. But you were saying it's important to prevent them getting the information. If they want to, in many cases, they can get it very quickly. Well, also, I think a lot of employers would not necessarily share that information because, you know, just modifying your hypothetical, if this were two companies who are competitors, right, that's something that the competitor might not want to share with their former employee's new employer. So I don't think it's going to be as easy as that. But, again, if they get the information, they can't rely on it. And this is a practical matter. You know, I mean, if I were advising an employer, I would just advise an employer not to do that because if you can't rely on the information, then why take on that risk? But, again, the inquiry provision is the key here, and, you know, that's why we fought so hard to keep it. Is it the case that when you ask for wage information, the employer is thinking this is the floor that I have to work with? In other words, I have to pay at least that in order to hire this employee? What's wrong with that? Well, the problem with that is if you're a woman or a person of color, that the baseline for that negotiation is going to be much lower than your white male counterpart. Maybe I was thinking of paying $40,000, but you just told me you were in $45,000. Now I know I've got to deal with that $45,000, and I may increase the salary. What's wrong with that scenario? You might increase it, but you might not increase it to the same level as some of the white men that work at that particular company because, again, the baseline is going to be lower. And, I mean... But the employee could disclose it. The employee has the option of disclosing it. If you're $45,000, $40,000 is where else? In the case of the employee, that's right. But in the case that the employee does not disclose the salary, what's wrong with asking? Because you're thinking you have to negotiate now to get that employee to say yes. Yeah, well, like I said, we're legislating in the aggregate. So, I mean, we know the data, again, for women and people of color is tainted by discrimination. So that baseline is going to be lower. My example is an extreme, extreme example. It's better than the snake on top of the box. And I think the objective of a lot of employers, I mean, in simple economics, is you want to pay someone as least as possible to get them to come work for you. And I think that's the issue that the Ninth Circuit had recognized in Risen. We can talk about that. But, you know, that's one of the reasons why Judge Steven Reinhart, rest in peace, said that, you know, this amounts to the financial exploitation, those were his words, of women. Because, you know, if you have this economic incentive to pay someone as least as possible, and you're using this discrimination-tainted information, you're just going to perpetuate the wage gap. But maybe it's good for women's employment because more of them will be hired because you figure you can pay them less. I think, well, I don't think the logic behind that quite works. I don't think the city would necessarily want that to happen. Yeah. Google just had to raise the salary of a lot of its men employees. Well, also, Google, if you look at the New York City amicus brief, or maybe the Massachusetts amicus brief, they've also embraced this type of law because in response to it, they said, you know, and a number of other companies have said this, but, you know, we think these laws are a bad idea. We're not going to ask anywhere. You know, even though we're not prohibited in this place, we're not going to ask anywhere. And the New York amicus brief, you know, points to, I believe, another Fortune 100 company that says, you know, relying on prior wage history contributed to an internal pay gap. So this is great for us. Another bank that New York City talks about said, it's quite easy why we did this. It's to be fair to our employees. So I think... But they weren't before the district court either. Well, the idea that other states were doing this and other companies were reacting positively to it, that point was made to the district court during oral argument. Our red light's been on for quite some time. I'm happy to keep going, but... No, thank you, Mr. Crenshaw. What makes you happy doesn't necessarily make us happy. And I will address the reliance provision over by... Okay. Mr. Estrada? Thank you. Thank you, Judge McKeon. May it please the court. I think we have a fundamental disagreement as to what the starting point is here. Mine is that when government tries to use a speech remedy, the government must affirmatively demonstrate that it is really necessary and use it surgically. If a government here or else... Does it depend on whether it's strict scrutiny or intermediate scrutiny? No. Do you say necessary? No. That's strict scrutiny. No, Your Honor, with all due respect. And to make that point, let me cite to you just two quotations from one of the more recent central Hudson cases, which obviously governs intermediate scrutiny. This is from Western States, the Thompson case. First, this is a quote from the Supreme Court. If the First Amendment means anything, it means that regulating speech must be a last, not a first, resource, unquote. The second one is we have made clear that if the government could achieve its interest in a manner that does not restrict speech or that restricts less speech, the government must do so. That's intermediate scrutiny. A government here or elsewhere would conclude that the minimum wage should be $25 an hour, and they can experiment to their heart's content to see if they have any business left in the city. Here or elsewhere. The government could not... I'm not sure if you saw that with language in Alameda Books and Nixon and Burson, which I asked Mr. Clark about, the bubble zone case, where the court seemed to accept a much lesser burden of proof than was accepted here. Well, we can talk about each and every one of these cases. Keep in mind that Alameda Books, at least ostensibly, was talking about the secondary effects on the Renton of putting in a second bookstore. They're looking at the element of proof that the government had to show. Well, to be sure, but that's not a content-based... That's a zoning restriction, right? If you put in a second bookstore of this type, that's going to lead to squalor and crime and that sort of stuff. Under the Renton case, that's not a restriction of the speech as such. That's a zoning restriction. Are you saying this is content-based? Yes, of course. How is it content-based? They don't care what the speaker... It's speaker-based. No, it is both. But why is it content-based? Because it addresses the subject matter of what can be said. I can ask the applicant, how is life today? What's your age? What do you think of the Mets? But I can't ask him, what did you make in your last job? That's clearly content-based. But it doesn't depend on the viewpoint of the speaker or what... Well, no, but under the law, under the First Amendment, there is quite a difference between content-based and viewpoint-based. Okay. You agree it's viewpoint-neutral. Yes, I do agree that it is viewpoint-neutral, but of course... Excuse me. Content-based restrictions are still subject to high scrutiny even when they're not viewpoint-based. Now, the point that I was going to make is that when you're talking about a speech remedy, whatever the perceived problem may be, the government must demonstrate that it is, in fact, necessary and that it will, in fact, solve the problem... Necessary to do what? To solve the problem in a direct and material way. Now, we have... You're getting that language from... From Edenfield, Greater New Orleans, any number of Supreme Court cases, including then-Judge Alito's decision for this court in Fitnews v. Papert. You know, the city has never come back and explained why it disputes that under the third prong of central Hudson, they must demonstrate that their restriction will advance the solution of the problem in both a direct and a material way. In Fitnews, out of space, that was irrational. I think we said counterintuitive. Judge Alito said counterintuitive and it was unsupported by the evidence. If you're going to single out one kind of alcohol, focus on that and leave malt liquor and all the other kinds of alcohol alone, it didn't seem to make any sense out of space. Again, we can go back to what the record is that the city is actually relying in on, because I think Mr. Pratt went through it very quickly and I think the district court was treated a little bit unfairness, with unfairness in how it was described. I think the district court examined what was in front of the city council, which was general statements of there is a wage gap. There was, I think, testimony by Barbara Price from the American Association of University Women who stated that there is a wage gap and in a footnote referred to studies, which if you go read them, sort of analyze the wage gap and conclude that there is an unexplained element to it that cannot be explained by choice of major or life, et cetera, and the hypothesis is that that element is due to discrimination. In part. In part. Now, for purposes of... Do you agree with Mr. Pratt and the district court that the city has a substantial interest in promoting wage equality? We agreed in the district court that the city has a substantial interest in eliminating discriminatory wage disparities to the extent that wage disparities reflect differences in experience, education, et cetera. We do not agree that that is a central hub of interest because I think my clients have an interest in having access to the information, which is also... No one is arguing that experience, past employment history, particular education and characteristics, but you aren't going to hire me to be an NFL football player. Correct. I may underline. The Browns have been beating down my door. The Cleveland Browns would, but no one else. All I'm saying is that we have a baseline agreement with respect to the substantiality of the interest that respects the government's interest in curbing discrimination, not in equalizing everybody. Why doesn't the ordinance that they've adopted promote the city's interest in... I was getting to that point. I mean, there are two aspects to it, and I think, as we made clear in our briefing, I think the district court was right in concluding that with respect to the inquiry part of it, it fails from three because if the problem is discrimination... You agree with the goal, but you say the method is... Oh, yeah. I mean, nobody is in favor of discrimination that's like this. We do think that if your goal is discrimination and getting rid of that, a speech remedy is an indirect way of getting at the problem. You don't disagree that there is discrimination or co-disparity? We agree, for purposes of this appeal, that to the extent that there is about a 3% to 6% gap that is unexplained, we can agree that that may be ascribed to discrimination. The problem for the city is that the studies they cite establish that that gap comes up in the very first job and there is no wage history, and therefore, by the hypothesis... That means there's an innate... From their perspective, there's an innate bias built in. You don't need wage history. You look at this woman as a person of color and automatically the person is going against... No, what that tells you is that the causal mechanisms that lead to the discrimination don't have anything to do with the wage history. Well, not for the first job, they don't. But if there's some mechanism at work there which causes more employers to say to a person of color or to a woman, perhaps they're not going to voice that. But if they get less pay from the start, their position is, you factor that in and subsequent job salaries, you're perpetuating it. That's exactly the point. I think, Judge McKee, if this were not a speech remedy, the government might be entitled to say or entitled to take a shot in the dark on that one. The problem for the government is that the doctrine does say on the Adam field in all these cases that they have to show that this will actually solve the problem in a direct and material way. You talk, however, about the initial entry into the job market. There's no past history. But some of the evidence produced in this case includes evidence that a woman who stays a long time in a company tends to have less of a wage differential than a woman who moves from one job to the next job to the next job. And in moving from one job to the next job to the next job, if her past salary is taken into account, having started out at a lower basis, if her salary is taken into account, that is perpetuating that discriminatory effect on her salary. And if in the subsequent moves you can't ask her what her past salary was, that this aspect of what has been holding her down would not be a problem. It might or might not. Part of the problem with the hypothesis and what is absent from the record in front of the city council and the district court is that we don't actually know the causal mechanism for the perpetuation of the discrimination. We've discussed cases that have considered not only studies and anecdotal evidence, but the fact that this is a problem, we aren't sure what the solution is, but common sense tells us what the solution is. And it seems to me that common sense, when we see how salaries can be affected by past employment history and past salaries, that common sense is a good argument for saying that this would be an effective remedy. Generally, cases from the Supreme Court like Edenfield and the New Orleans case have actually said that common sense and speculation are not enough under this problem of Central Hudson. We have more than common sense, but it's an element we can consider. It is an element if you can also point to a causal mechanism that lets you... I want to finish answering that, but can you also point me to the language, the page site in Edinburgh where the court says that? I'm sorry, in Edenfield, Your Honor? I'm looking for Melameda books now. I'm looking at the language Melameda books, Turner Broadcasting System, which is a strict scrutiny case. They all say the legislature can consider common sense. Oh, no, no, no. This is from Greater New Orleans where the government's argument was that the publication of the alcohol level was a basis of common sense, because if you publish the alcohol level on the Court of Ears, that was going to lead to a strength warrant. Oh, but the problem there was it didn't make any sense. It didn't apply to wine. Well, that was a different problem with the scheme, but in fact what the court first said was that it could not rely on speculation. But a few seconds ago you said the court just said that you can't rely on common sense under Central Hudson. On speculation or just pure common sense. I want you to give me the site for that. No, no, no. If I said just that, obviously common sense applies where common sense applies, Your Honor. But what I was saying is that when you're trying to restrict speech, you have to prove a causal mechanism that will allow you to conclude that this will actually work. Why can't you assume the mechanism based upon common sense? That's what I'm trying to get at. No, no. I am not arguing that common sense doesn't apply when common sense applies. You know, the point that I'm making... Are you agreeing then that common sense will allow a legislative body to assume a causal relationship? When it makes sense not to conclude... When it's sensible. When it's sensible. Okay. And when there is a record that allows the legislative body to conclude that. No, no, no. I mean, the reference to common sense is when there is no record, there still are common senses. Well, what if you need a record? Help us understand. If there's a record, why would you need common sense? Well... If there's a record, why would you need common sense? No, the point that I was going to make is in cases like Burson and in other cases like that, the common sense that the court is speaking of is the judgment of experience. What I was going to say... Where in Burson is the experience? There was a situation with the bubble zone around... Polling places. Pardon me? Polling places. Around... Did the court in Burson rely upon similar appeals from bubble zones around polling places? No, it was history. It makes sense that if you put a bubble zone around polling places, you're going to solve the problem. If I could... In a strict scrutiny case. If I could complete the point that I was going to make to Judge Roth, which was we know that this comes up in the first job and we know as well that the city council did not investigate how this history actually is used in particular employment contexts. And so there is... You're losing me now. What comes up on the first job? The... Wages discrepancy. Yeah. Why is that, do you think? The ethers? No, I mean, for purposes of this, we assume that if there is a discriminatory wage gap, it may arise when there is no wage history, which is part of our point, which gives you at least on the surface and on the basis of common sense... That's what Maddie's testimony is, and it starts at the very beginning. Correct. And if you appeal to common sense, you would then intuitively think that as a solution to the problem, then reliance on the wage history is perhaps not the obvious solution to a problem that arises when there is no wage history, just to turn the point around. Second point is, as time passes, there are other informational components of the wage history that have First Amendment value to employers. If you bar usage of that information, you're invading other First Amendment interests that have... What are the interests? Those have signals as to experience and... You're going to find out about experience. You're going to ask about experience. To be sure... You're going to ask about education. But if I could address that point, in the speech context, government is usually not entitled to say that I may not ask a question or I may not have access to a paper because I can go read it on cable news. Usually, it's for the government to demonstrate that the restriction is actually necessary to achieve the purpose, not for me to demonstrate that I cannot get by without the speech or the information. If I could get to the fourth point, because although one might have sort of interesting arguments about the third prong, the district court didn't get to the fourth prong, and I think the fourth prong is actually also very exacting under the court cases. Not more extensive than necessary? Correct. And there is a great level of under-inclusiveness and over-inclusiveness here, right? Because the ordinance applies even in cases where it could not possibly serve the city's asserted interest. What are some examples of that? Well, we pointed to some in our brief, right? If the goal of the regulation, for example, is to close the wage gap to catch up women and minorities to white males who make $1.79 and speech is the remedy, you can't ask. It is inexplicable why you can't ask another question to white male applicants, even though it's a speech restriction. That's a bad idea, actually. Maybe we should take that back to city council. If you think about that... Why wouldn't... Wait, I'll go back and give you the ordinance. But you're saying that the ordinance would allow them to ask about wage history of white males? Yeah, you cannot ask anybody, and even though this is ostensibly about... So they can't ask white males, obviously. No, no. I misunderstood what you said. And so, you know, in a context in which, as the Supreme Court has said, precision is a touchstone, you know, you ask the... You may not ask a question. It's a speech remedy to the people to whom you're trying to catch everybody up. That makes no sense. You're saying that if this was a good fit, I use the term fit under the first one, and then... It is a good fit. What they would do is they say you can ask white males, but you can't ask a subject class. Does that make sense? Correct. If you're protecting somebody from discrimination... Because then you're going to take somebody who's got a built-in advantage and perpetuate that advantage by asking them what they got, and they're going to give you the answer by itself. That makes no sense. Well, I don't know, because, you know, the city's theory is that you're trying not to perpetuate a gap that exists. Okay, but you're trying not to perpetuate the top of the gap as well as the bottom of the gap. No, because, you know... I mean, this is the theory of the city. You continue to pay the white male more because that white male's always gotten more, do you see? No, I am just taking what the city council said at face value. They said they were trying to close the gap. They sort of assumed that the free market value and the fair pay is the $1, and that what needs to be closed is the $0.79 to the $1. If you're going to choose a speech remedy to close that problem, it seems to me that saying that you cannot ask, you know, the person who's not, you know, the problem is overbroad. You're saying they just ask the minority person... The affected classes who are... No equal protection problem with that. ...who are victims of discrimination. Now, again, there are any number of cases like we point out, lockstep salary, lockstep... Yeah, so if you ask the $1 earning male he's earning $1, then why cannot the prospective employer say, all right, well, if a man's making $1, I'm going to pay this scale $0.90. Well, that would be actual discrimination. If you don't know if he's making $1... That would be actual discrimination. And we don't want to have any of that, do we? Yeah, no. No. That would be actually actionable under the actual discrimination law. That would not be a speech claim. And, of course, we have, you know, the other side of the scale where, you know, the city has an exception if you voluntarily disclose. Now, the city says, this is because we want to have the power in the hands of the applicant. Now, here's where we get to the standard, right? Because it's a speaker-based restriction. And Sorel and all these cases tell you that if you are going to make a speaker-based distinction, whether intermediate scrutiny or any kind of scrutiny, that is where the law is the most suspect. But Sorel, at least most of the courts have adjudicated after Sorel and have cited Sorel, look at it not as a most scrutiny, heightened scrutiny kind of case, but as an intermediate, central Hudson kind of case. Well, I think Sorel, if you read it carefully, first said it was heightened scrutiny. It did. It did not say, in fairness, strict scrutiny, but it said heightened scrutiny. But he then said it does not matter because this spells central Hudson. We think that is true here as well, though I think in fairness to what Justice Kennedy said in Sorel, what he did say, I think, is equally applicable here, which is that when you have a speaker- and content-based restriction, you have to be especially exacting with questions of fit and be especially suspicious when a city or state government says that you're going to put the power in the hands of one speaker and disable one speaker only. Here, you have a law that basically says there is one category of speakers, you know, employers, not landlords, not bankers, not anybody else, who cannot ask this question and cannot rely on the question. If I could take just one moment to deal- But they aren't the ones who are determining what the wage is going to be of the new employee. I understand, you know, the nature of the problem, Judge Ross, and I have no issue with the city's desire to address the problem. My issue here is with the choice of remedy, a speech remedy. You know, the city, as we have made very clear, had an obligation to consider other potential solutions to the problem. Where are they? Well, sure. One of the studies that the city actually was cited to by Ms. Price, which is one of the American Association of University Women, actually, you know, this is the 2017 version of the study, actually pointed out the internal equity studies, which we also urged upon the city council have been very successful in solving this problem. How does that work? That's kind of an internal self-examination? Yes, and- Theoretically, how would self-examination work out? Well, according to this study that was presented by the AUW, has been successfully used by some organizations in actually realizing that there were inequities and fixing them. Now, there was an example- But it seems that in some organizations it may well work. In other organizations, it may not work. Well, and again, the obligation of governments under the doctrine is to consider and thoughtfully explain why these issues have been considered and not work. I will, you know, remind the court with all respect that even when potential choices are voluntary with the parties. In Sorrel, you know, the court pointed out that a doctor could put a sign saying no solicitation, and that was an alternative that the government should have considered. And of course, there are other levels of scrutiny. I noticed Ross wrote the opinion in Playboy that ultimately went to the Supreme Court, and there was, you know, the voluntary use of blocking software. You know, these things are usually considered by the courts in examining whether the government has considered whether speech, which is the last, you know, resort, has, you know, really- is actually really needed to solve this problem. So we pointed to these self-evaluations. We also pointed to more- to more aggressive enforcement of anti-discrimination laws. And keep in mind, again, we're not here to dispute the government's ability to tackle problems. We're here to dispute the choice of speech as the first remedy. This may turn on the outcome of the disparate impact theory, but if you're prosecuting, say Title VII came out of failure to hire and the employer comes in and says, well, I gave her less money because I knew what she'd been making before. I wanted to lure her away from the other job. I gave her an increment over the other job. I'm sorry that it's a certain percentage less than some of my male employees were making, but it's based upon her prior salary history. What you've done then, as they have argued, is you've institutionalized a pay gap, but the employer, under a discrimination theory, he or she's not discriminating. He's based the income not upon the person's gender, but upon their prior salary history. That is correct, generally, under federal equal pay law. But again... But you just said that's one way to deal with the problem. No. I mean, I said that is greater enforcement of anti-discrimination law. That's one way to deal with the problem. Well, to deal with discrimination that is actual discrimination, I think the hypothetical that you gave me involved an employer that was not discriminating. Right. The employer is just following the line and basing upon something that came before, which builds in and institutionalizes discrimination. But my hypothesis is going to be that there has been discrimination of 0.1. And my hypothesis is that you have to fix that by enforcing anti-discrimination laws. Clearly,  can't be at 0.20. Ted, what I said is not discrimination. Why do you enforce anti-discrimination laws when you know? My hypothesis, maybe I was not clear, is that if there is a discrimination that arises at the first job, maybe you should fix it at the first job. And if greater enforcement of discrimination laws is needed, that would be the appropriate point for a government to intervene and make sure that discrimination does not arise then. We don't have to solve the whole problem at once. When you have a problem, you can pick out a certain part of it. And I think it would be a lot harder to solve the problem, perhaps, at the first job, because it's very difficult to prove there was discrimination. But as the employment history goes along, and if the new salary is going to be based on the old salary, that's a good way to cut out the salary as a source of wage discrimination. There are two problems with that, Judge Roth. The first one is that the law generally is clear under your case in Mariani, and I think in the Supreme Court in the decision in NIFLA last term, that governments have some leeway in solving problems one step at a time, with the caveat, which was recognized by the Supreme Court in the Mariani case, and by the Supreme Court in NIFLA, is that when they do that, they cannot do it for reasons related to the suppression of speech. Again, there's always the example, you can't do this if you're going to have content-based exceptions. If the city is going to have a solution that is speech-based, it cannot turn around and say, oh, but we're going to allow the employee to remain in power of the information and have a deepening exception that deserves the goal of the ordinance and makes it over-inclusive or under-inclusive. For better or for worse, the doctrine requires the government, when it picks speech solutions,  at solving the problem, solve only the problem, and to have a very good fit. If the government wants to solve the problem through other tools in its arsenal, it has greater leeway. But what are those other tools? Any self-evaluation? Is there anything else? Well, I mean, you know, the Supreme Court is not very forgiving with speech remedies, and it has even gone so far as to say if the government wants to conduct a public education campaign on its own dime, this is what the court did last term in NIFLA, the government can enforce laws, it can do any number of other things, but it doesn't, you know, have the right, unless it has a very good record and a very good reason and a very good fit. Precision, it said the court. You're saying very good fit. We're looking now at Supreme Court's language on board of trustees of the State University versus Fox. That was 1989. And what the court said, a fit that is not necessarily perfect but reasonable. It's a reasonable fit that the court has to have. That's my case because that was 1989. And as we make clear in our brief, you know, Sandra Hudson has suffered an evolution in the court's work. And this is why I started, when I started my argument, I quoted from the Western States case, which is also a Sandra Hudson case, and where the court took, you know, the same element of Sandra Hudson. It said if the government could achieve its interest in a manner that does not restrict speech or that restricts less speech, the government must do so. And so, yes, you know, the government started by saying... And that's reasonable. I understand that. Yeah, but that was 20 years ago. And I think the government over the last two decades, excuse me, the court over the last two decades has moved to a greater level of effectiveness. It's still not saying it has a single best disposition. Excuse me, Your Honor? It's still not saying it has a single best disposition. No, but it does say that if the government could do it in some other way that is not speech-invasive, the government must do so. Okay, and that's the basic First Amendment law. Well, that's right. But I think, you know, in the examples that the court has given, including, you know, last term in NIFLA, you know, the court has said, you know, that among the examples that the government may not slight include voluntary conduct, including public relations campaigned by the government itself. I missed that. Including... Public education campaigns by the government itself. That's, you know, the Becerra case from last term. But public education has also worked out pretty well in terms of dealing with discrimination. Again, you know, one may disagree with many things that the Supreme Court does, but that is, you know, the state of the doctrine. And, you know, bottom line is, you know, the Bill of Rights is fairly cherished, too. And when the government wants to do speech remedies, you know, the walls are pretty high. If I could just take one moment to deal with the part of our first appeal. You know, the district court basically took the view that the reliance provision does not involve speech. And, you know, we think fairly quickly that that is clearly incorrect for two reasons. You know, the first one is that, you know, the reliance provision actually does deal with speech on the face of the ordinance. As the district court looked at the ordinance, I think it basically conceived of the ordinance as a kind of thought crime that, you know, an employer determines what a salary might be by thinking of it and not writing it down on a file or communicating it to somebody. And it's sort of difficult to understand why the city council would pass such an ordinance or how it would enforce it. If you read, you know, the ordinance, you know, its plain terms actually do make clear that what the city council contemplated was a give and take that is actually inherently written with speech. It says to determine the wages for a certain individual at any stage in the employment process, including the negotiation or drafting of any employment contract. So it's inherent in the reliance provision that the determination is the act of picking the wage and negotiating it with the employee. And so the threshold determination of the district court that this was purely conduct and did not involve any speech activity at all. I think that negotiation involved speech, which I think you're probably right about that. And to the extent that you factor out prior history, then you're impacting the employer's speech. Right. I mean, it seems to me... Isn't that the whole point here? Well, correct. I mean, you might say in your judgment, you may conclude that this is within the city's power. We disagree. I'm addressing his threshold determination that this is not speech. Now, for the same reasons I've been discussing, I think ultimately, I think the city would not meet central Hudson or much less any higher level of scrutiny because ultimately, even if you think that this has some tendency to solve the underlying problem of discrimination as a matter of common sense, it will fail the type of fit that the Supreme Court actually requires. But I think at the threshold, the district court on the face of the ordinance was clearly incorrect in concluding that this does not implicate speech at all. You know, the second reason that we think that the district court was incorrect is that one is the reason that the court gave in sorrow, which is that if you preclude someone from using information after you have acquired the information by asking somebody else, that is a burden on the inquiry, that is a burden on the use of information that has been obtained by expressive activity, and that itself is a matter of First Amendment concern. That was in fact what was at issue in sorrow. Now, you know, the city seems to think that it was of great significance and maybe conclusive in sorrow that the information was going to be used for further expressive activity in sorrow with marketing. A, this is true here too because it's going to be a give and take with the employee, but B, that is not actually a correct reading of sorrow because Justice Kennedy did point out that this would be a question under the First Amendment and I'm quoting, even if the information were treated as a commodity. And so even with the derivative use of the information, having made the inquiry as Judge Roth hypothesized earlier by calling the earlier employer, you could not really say as a matter of the primal First Amendment case law, sorrow and the case that it cited, you know, Reinhart, that if you burden my right to ask a question by not allowing me to use the information, that that's not a First Amendment problem at all. Now, as to the merits of the question, I do think that even if you thought that there was some common sense appeal to the proposition that you can curb the use of the information and not really worry about all the non-discriminatory aspect of the information to which the employer actually also has, you know, the right to use and that have First Amendment value, and you're going to get past, you know, the pronged three analysis. Ultimately, I think it's very difficult for the city to overcome the pronged four central Hudson analysis because of the fit. And that's true. And that's true as to both of them, especially in a world as we are here where whatever, you know, the city may say is central Hudson plus at least after Sorrell and Reid. And that point, we think, is made clear both by this court's decision in King, which made clear that when something is content-based, you know, even if it's otherwise... At King v. Governor of New Jersey? Yes. But there again, we talked about common sense being sufficient. Well, sure. But you also said that even with respect to lesser protective speech, if it's content-based, you get strict scrutiny unless an exception actually applies. And that the exception that was held to apply there was professional speech, which the Supreme Court ultimately turned down in NIFLA. But we do. I get the feeling if I don't step in, we're going to be here till Sunday. Thank you, Your Honor. Thank you. I understand your argument. Thank you for making it, Mr. Estrada. Briefly, not like a New York Minute. It'll be brief. So I'll start with pronged four. There was a discussion around pronged four and what exactly is required. Pronged four is not a least prescriptive means test. The Supreme Court has never changed that. It's a reasonable fit. It's a reasonable fit. We're there. I also want to address this idea that the ordinance could somehow allow asking the salary history question of white males. I think the questioning here today would be problematic. You're talking about a textbook equal protection issue. That's it. In addition to the constitutional issues that that creates, I think it's very hard to apply practically. I mean, this is America. Racial identity is very complex. You can't have an HR person or just anybody for that matter sitting across from someone trying to figure out if they're a white male or not. And also on that point, I want to talk a little bit about your decision, Judge McKee, and Heffner. I think it's wrong. You got that wrong? When I'm asking, what did I get wrong? I think you got it right. I think it's a beautiful example for us. I think it's a beautiful example for us because that dealt with the funeral director's law in Pennsylvania, and there were two commercial speech restrictions at play. One passed intermediate scrutiny and one didn't. The one that didn't was a prohibition against funeral homes using trade names. And the idea was to protect people from being misled by trade names. You said, look, there's not even an allegation here that people are being misled by trade names. And this also suffers from the Edenfield problem of no evidence because there was no allegation. And also, it suffers from the irrationality problem of cases like Rubin and Pitt News. And so you said it made no sense, so it doesn't pass intermediate scrutiny. On the other hand, there was another commercial speech restriction in the form of a prohibition against funeral home sales employees from selling pre-need funeral arrangements to people who come in and want those types of arrangements. And the idea was that those people are very vulnerable, right? So if you prohibit being paid off of commissions, then you'll disincentivize people from taking advantage of those vulnerable consumers. And there you reason just based on common sense. You didn't require an empirical demonstration. I mean, there, you didn't require you didn't require some empirical demonstration that if you eliminate or decrease commissions that less people are going to be taken advantage of by funeral homes. No, you just simply used your common sense. And on the fit point, you were actually cited by King for the exact proposition that we've already talked about, which is the fit doesn't have to be perfect here. I also want to talk about the first jobs point that Mr. Estrada brought up. So there's no evidence that the entire wage gap arises at first job. But I agree with you, and there was a confession that there was some discriminatory activity at the first job. It doesn't matter because at some point that first job salary history it becomes prior salary and gets relied upon in the subsequent job. And the chamber also mentioned that that the percentage of the wage gap that's due to discrimination is about three to eight three to eight percent. That's not accurate. That's based off a study that was using a data set from the 1980s that was projecting where the gap would be in the 90s. And we discussed that in our brief. But as far as these percentages go it doesn't matter. It doesn't matter if it's three percent or it's 30 percent. If we've eliminated wage history from being relied upon because of the discriminatory taint we've promoted our goal of wage equity. And it's not good enough to simply say you know well this gap is only three to eight percent according to some social science that was done in some legal briefs. And we say to women and people of color you know it'll dissipate over time. You know just work harder you know work your way up and this gap will go away at some point and there are some studies that support that. We don't have that option of doing that. And that's not and that's not what this law wants to do. And then I want to switch to reliance because we do think the district court got that correct because the reliance provision regulates conduct not speech. The act of relying on a piece of information is conduct. Just to use an example if you look at Mr. Sutter's point that when that reliance translates into contract negotiation that give and take that becomes speech and you're burdening speech at that point. No because you don't speech doesn't trigger liability under the reliance provision. Right. The moment you rely on salary history you violated the ordinance. And an example is this. It's illegal to rely on somebody's race or gender in deciding how much to pay them. Right. That doesn't that doesn't turn those types of anti-discrimination laws into speech restrictions. It's a prohibition against relying and that's what this ordinance does here. And even if there was some incidental impact on speech that doesn't require first amendment scrutiny either. The Supreme Court makes this example over and over again and it makes it in the expression terror design case that the chamber cites as well as Sorrell. And the example is that if you have an anti-discrimination law that prevents or prohibits discrimination in employment just because it would require an employer to take down a sign that says white applicants only doesn't turn that regulation into a speech restriction. It doesn't. The impact is incidental. We don't think there's an incidental impact here at all but even if that were the case you still wouldn't have to engage in first amendment scrutiny on the reliance provision. And as far as Sorrell goes Sorrell is distinguishable because that was a speech restriction on its face. On its face. It wanted to prohibit the use of this provision. You're going to let somebody stop being race? Does that mean you stop being race? There was a speech restriction on its face that doesn't apply here. There was also some viewpoint discrimination going on there. And if the court doesn't have any more questions I'll just You were just there. I'll leave off where I should have opened which is I want to introduce and acknowledge my colleagues Jane Isfan and Benjamin Field who are responsible for the legal briefs and the arguments you heard today. Thank you. Thank you Madam President. Did you get a transcript of this case? I meant you did one of the last cases. Did you contact counsel in that case to say that Mr. Beeson and Rincey had a transcript? Yes. Okay. Thank you.